

FRANCIS O. SCARPULLA (41059)
CRAIG C. CORBITT (83251)
MATTHEW R. SCHULTZ (220641)
PAMELA E. WOODSIDE (226212)
TRAVISS GALLOWAY (234678)
ZELLE, HOFMANN, VOELBEL, MASON
& GETTE LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone:    (415) 693-0700
Facsimile:    (415) 693-0770
fscarpulla@zelle.com
ccorbitt@zelle.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| G&C AUTO BODY, INC., on behalf of itself and all others similarly situated, | CASE NO. CV 08 1990 |
| Plaintiff, | |
| vs. | **CLASS ACTION COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| GUARDIAN INDUSTRIES CORP.; GUARDIAN FABRICATION INC.; GUARDIAN WALLED LAKE FABRICATION CORP.; GUARDIAN GLASS COMPANY; PILKINGTON GROUP LIMITED; PILKINGTON NORTH AMERICA INC.; PILKINGTON HOLDINGS INC; NIPPON SHEET GLASS CO.; COMPAGNIE DE SAINT-GOBAIN; SAINT-GOBAIN CORPORATION; CERTAINTEED CORPORATION; SAINT-GOBAIN GLASS CORPORATION; SAINT-GOBAIN GLASS EXPROVER NORTH AMERICA CORPORATION; ASAHI GLASS COMPANY LIMITED; AGC FLAT GLASS; AGC FLAT GLASS NORTH AMERICA; AGC FLAT GLASS EUROPE; AGC AMERICA, INC.; AGC INTEREDGE TECHNOLOGIES, INC.; AMA GLASS CORPORATION; PPG INDUSTRIES, INC.; PPG AUTO GLASS, LLC; PPG INDUSTRIES INTERNATIONAL INC.; JOHN DOES IX, | |
| Defendants. | |

Plaintiff G&C Auto Body, Inc. ("Plaintiff"), on behalf of itself and all others similarly situated, brings this action under the federal antitrust laws, Section 1 of the Sherman Antitrust Act of 1890, 15 D.S.C. § 1 ("Sherman Act"), and Section 4 of the Clayton Antitrust Act of 1914, 15 U.S.C. § 15 ("Clayton Act"), against the above-captioned Defendants. Plaintiff makes the following allegations on information and belief, except as to those paragraphs that pertain to Plaintiff, which are based upon personal knowledge. Plaintiff's information and belief are based on, *inter alia*, the investigation made by its attorneys.

## NATURE OF CLAIM

1.    This case arises from an international cartel among the world's leading manufacturers of Flat Glass (defined below) to fix, raise, maintain, and/or stabilize prices of Flat Glass in the worldwide Flat Glass market, including in the United States.

2.    "Flat Glass," as used in this complaint, includes all unfabricated and fabricated glass products manufactured through the "float process," whether transparent, opaque, translucent, reinforced or otherwise, formed in a flat shape, used for cutting into window panes, or glass formed flat and subsequently bent or curved, used for fabrication into automobile windshields.

3.    The "float process" is the process of manufacturing Flat Glass by passing molten glass from a melting furnace to a bath in which a continuous ribbon of molten glass floats on a liquid of greater density than the glass, normally composed of molten tin, where it is polished under controlled temperatures and subsequently fed into an annealing oven, where it is gradually cooled. The float process has replaced all other methods of producing Flat Glass in the United States, due to its ability to produce Flat Glass of uniform thickness with an absence of distortions. The float process also reduces fuel consumption and labor costs relative to other glass production methods.

4.    Asahi, Guardian, NSG/Pilkington and Saint-Gobain (defined below) hold a combined 80 percent market share in the European Flat Glass market, and Asahi, Guardian, PPG and NSG/Pilkington hold a combined estimated market share of 73 percent in the North American Flat Glass market.

## JURISDICTION AND VENUE

5.    This action arises under Section 1 of the Shennan Act and Section 4 of the Clayton

1  Act.

2      6.      Jurisdiction of this Court is founded on Section 4 of the Clayton Act, 15 US.C. § 15,

3  for violations of Section 1 of the Sherman Act, 15 US.C. § 1, and Section 4 of the Clayton Act, 15

4  U.S.C. § 15, and 28 U.S.C. §§ 1331, 1337.

5      7.      Venue as to Defendants (set forth below) is proper in this Court pursuant to Sections

6  15(a) and 22 of the Shennan Act, and 28 US.C. § 1391(b), (c), because Defendants are found and

7  transact business in the geographic region covered by this judicial district and/or the claims arose at

8  least in part in the geographic region covered by this Court.  Defendants regularly and continuously

9  conduct business in interstate and foreign commerce between and among the several United States

10  and foreign countries.  The interstate trade and commerce described herein has been carried out, in

11  part, within the Northern District of California.

12                                    **PARTIES**

13  **A.    Plaintiff**

14      8.      Plaintiff G&C Auto Body, Inc. is located at 251 Bellevue Avenue, Santa Rosa, CA

15  95407.  Plaintiff purchased Flat Glass from one or more of the Defendants during the Class Period

16  (defined herein), and was damaged as a result of Defendants' unlawful conduct.

17  **B.    Defendants**

18      9.      Defendant Guardian Industries Corp. ("Guardian") is a privately held Delaware

19  corporation with its world headquarters located at 2300 Hannon Road, Auburn Hills, Michigan

20  48326-1714. Guardian is principally engaged in the manufacture and fabrication of Flat Glass, and

21  ranks as one of America's largest glass and glass products manufacturers, accounting for between

22  seven percent and eight percent of the US. glass market. Between January 1, 2001 and the present

23  (the "Class Period"), Guardian, directly or through its subsidiaries or affiliates, manufactured and

24  sold Flat Glass to customers throughout the United States.

25      10.     In 2005, Guardian earned $5 billion in revenue and employed 19,000 employees.

26  Approximately 40 percent of its revenue ($1.95 billion) is derived from U.S. glass-related sales.

27  Guardian is a major supplier of glass products, primarily producing float glass, fabricated glass, and

28  fiberglass products.

11.    Defendant Guardian Fabrication Inc., a Delaware corporation, is a subsidiary of Guardian, with its principal place of business at 2300 Harmon Road, Auburn Hills, Michigan 48326-1714. Guardian Fabrication Inc. manufactures and markets flat architectural and automotive glass. During the Class Period, Guardian Fabrication Inc., directly or through its subsidiaries or affiliates, manufactured and sold Flat Glass to customers in the United States.

12.    Defendant Guardian Walled Lake Fabrication Corp., a Michigan corporation, is a Guardian subsidiary with its principal place of business at 3160 Ridgeway Ct., Walled Lake, Michigan 48390-1670. Guardian Walled Lake Fabrication Corp. manufactures and markets tempered Flat Glass products. During the Class Period, Guardian Walled Lake Fabrication Corp., directly or through its subsidiaries or affiliates, manufactured and sold Flat Glass to customers in the United States.

13.    Defendant Guardian Glass Company, an Ohio corporation with its principal place of business at 2300 Harmon Road, Auburn Hills, Michigan 48326-1714, is also a Guardian subsidiary. Guardian Glass Company produces architectural glass, auto glass replacement products, and a variety of glass for use in residential applications such as windows, mirrors, and patterned specialty glass. During the Class Period, Guardian Glass Company, directly or through its subsidiaries or affiliates, manufactured and sold Flat Glass to customers in the United States.

14.    Defendants identified in paragraphs 9 through 13 are collectively referred to herein as "Guardian."

15.    Defendant Pilkington Group Limited ("Pilkington") is a UK corporation with its principal place of business at Prescot Road, St. Helens, Merseyside, W AIO 3TT, United Kingdom. During the Class Period, Pilkington Group Limited was the largest glass manufacturer in the United Kingdom and controlled almost one quarter of the market. During the Class Period, Pilkington Group Limited, directly or through its subsidiaries or affiliates, manufactured and sold Flat Glass to customers in the United States.

16.    Defendant Pilkington North America Inc. ("Pilkington North America") is a subsidiary of the Pilkington Group, incorporated in Delaware with its principal place of business at 811 Madison Avenue, Toledo, Ohio 43604-5684. Pilkington North America manufactures and

markets flat and safety glass for the building and automotive markets and is one of the largest producers of float glass in the United States. During the Class Period, Pilkington North America, directly or through its subsidiaries or affiliates, manufactured and sold Flat Glass to customers in the United States.

17.    Defendant Pilkington Holdings Inc. ("Pilkington Holdings") is a Delaware corporation with its principal place of business at 811 Madison Ave, Toledo, Ohio 43604-5684. Pilkington Holdings is the wholly-owned subsidiary of Pilkington Overseas Holdings Ltd. Pilkington Holdings holds Pilkington's United States-based assets. During the Class Period, Pilkington Holdings, directly or through its subsidiaries or affiliates, manufactured and sold Flat Glass to customers in the United States.

18.    Defendant Nippon Sheet Glass Co. ("NSG") is one of the world's largest glass companies, second only to Asahi Glass Co. NSG had annual sales of approximately $7.6 billion in 2006. It is incorporated in Japan and headquartered in Tokyo, with its principal place of business at 2-1-7 Kaigan, Minato-ku, Tokyo, 105-8552, Japan. During the Class Period, NSG, directly or through its subsidiaries or affiliates, manufactured and sold Flat Glass to customers in the United States. Pilkington was acquired by NSG on June 16, 2006.

19.    Defendants identified in paragraphs 15 through 18 are collectively referred to herein as "NSG/Pilkington."

20.    Defendant Compagnie de Saint-Gobain ("Saint-Gobain") is a French corporation, founded in 1665 in Paris and headquartered at La Defense, Les Miroirs 18, avenue d' Alsace 92400 Courbevoie, France. Originally a mirror manufacturer, it now also produces a variety of construction and high-performance materials. Saint-Gobain accounts for between 12 percent and 15 percent of the U.S. glass market. It is one of the largest world glass manufacturers, operating in over 54 countries, with more than 1,000 subsidiaries. Flat Glass sales were an estimated $5.4 billion in 2005 and an estimated $6.6 billion in 2006 (representing 12 percent of sales). During the Class Period, Saint-Gobain, directly or through its subsidiaries or affiliates, manufactured and sold Flat Glass to customers in the United States.

21.    Defendant Saint-Gobain Corporation ("Saint-Gobain Corp.") is a U.S. holding

4

1    company incorporated in Pennsylvania with is principal place of business located at 750 East

2    Swedesford Road, P.O. Box 860, Valley Forge, Pennsylvania 19482-0101. Saint-Gobain Corp.'s

3    businesses in the United States and Canada now account for 16 percent of the company's worldwide

4    sales and 11 percent of its employees. The Flat Glass business sector of Saint-Gobain Corp.

5    represents about one percent of its sales in the United States and Canada. During the Class Period,

6    Saint Gobain Corp., directly or through its subsidiaries or affiliates, manufactured and sold Flat

7    Glass to customers in the United States.

8        22.    Defendant CertainTeed Corporation ("CertainTeed") is a U.S. subsidiary of Saint-

9    Gobain. It is a Delaware corporation, headquartered at 750 East Swedesford Road, P.O. Box 860,

10   Valley Forge, Pennsylvania 19482-0101. During the Class Period, CertainTeed, directly or through

11   its subsidiaries or affiliates, manufactured and sold Flat Glass to customers in the United States.

12       23.    Defendant Saint-Gobain Glass Corporation, a subsidiary of Saint-Gobain, is a U.S.

13   holding company, incorporated in Delaware with its principal place of business at 750 East

14   Swedesford Road, P.O. Box 860, Valley Forge, Pennsylvania 19482-0101. Its 2006 U.S. sales were

15   41.8 million. During the Class Period, Saint-Gobain Glass Corporation, directly or through its

16   subsidiaries or affiliates, manufactured and sold Flat Glass to customers in the United States.

17       24.    Defendant Saint-Gobain Glass Exprover North America Corporation is a Saint-

18   Gobain subsidiary, incorporated in Delaware with its principal place of business at 7655 E. Gelding

19   Drive, Suite B-2, Scottsdale, Arizona 85260. During the Class Period, Saint-Gobain Glass Exprover

20   North America Corporation, directly or through its subsidiaries or affiliates, manufactured and sold

21   Flat Glass to customers in the United States.

22       25.    Defendants identified in paragraphs 20 through 24 are collectively referred to herein

23   as "Saint-Gobain."

24       26.    Defendant Asahi Glass Company Limited ("Asahi") is incorporated under the laws of

25   Japan and headquartered at 1-12-1, Yurakucho, Chiyoda-ku, Tokyo 100-8405, Japan. It is one of the

26   core Mitsubishi companies in the Mitsubishi Group. Asahi is the world's number one maker of Flat

27   Glass and claims 15 percent of the world Flat Glass market. Asahi also accounts for between five

28   percent and seven percent of the U.S. glass market. In 2005, Asahi derived $13 billion in revenue.

1 │ During the Class Period, Asahi, directly or through its subsidiaries or affiliates, manufactured and
2 │ sold Flat Glass to customers in the United States.

3 │      27.    Defendant AGC Flat Glass covers all the Flat Glass operations of the Asahi's AGC
4 │ Group, and is the world's leader in Flat Glass manufacturing. AGC Flat Glass is incorporated in
5 │ Belgium and headquartered at 166 Chaussee de la Hulpe, 1170 Brussels, Belgium. During the Class
6 │ Period, AGC Flat Glass, directly or through its subsidiaries or affiliates, manufactured and sold Flat
7 │ Glass to customers in the United States.

8 │      28.    Defendant AGC Flat Glass North America is incorporated in Delaware and
9 │ headquartered at 11175 Cicero Drive, Alpharetta, Georgia 30022-1166. Previously AFG Industries
10 │ Inc., AGC Flat Glass North America is a subsidiary of Asahi. It is the largest supplier to the
11 │ construction and specialty glass markets, and the second-largest glass manufacturing company in
12 │ North America. During the Class Period, AGC Flat Glass North America, directly or through its
13 │ subsidiaries or affiliates, manufactured and sold Flat Glass to customers in the United States.

14 │      29.    Defendant AGC Flat Glass Europe, formerly known as Glaverbel S.A., is also part of
15 │ the worldwide Asahi group. It is incorporated in Belgium and headquartered in Brussels, Belgium.
16 │ AGC Flat Glass Europe is a leading global glass manufacturer, with industrial locations across
17 │ Europe. During the Class Period, AGC Flat Glass Europe, directly or through its subsidiaries or
18 │ affiliates, manufactured and sold Flat Glass to customers in the United States.

19 │      30.    Defendant AGC America, Inc. ("AGC America"), previously known as Asahi Glass
20 │ America, Inc., is an Asahi subsidiary and Flat Glass manufacturer, incorporated in Delaware with its
21 │ principal place of business at 2201 Water Ridge Parkway, Suite 400, Charlotte, North Carolina
22 │ 28217. During the Class Period, AGC America, directly or through its subsidiaries or affiliates,
23 │ manufactured and sold Flat Glass to customers in the United States.

24 │      31.    Defendant AGC InterEdge Technologies, Inc. (formerly InterEdge Technologies) is a
25 │ wholly-owned subsidiary of AGC Flat Glass. It is incorporated in California and headquartered at 85
26 │ Liberty Ship Way, Suite 110B Sausalito, CA 94965. During the Class Period, AGC InterEdge
27 │ Technologies, Inc., directly or through its subsidiaries or affiliates, manufactured and sold Flat Glass
28 │ to customers in the United States.

32.    Defendant AMA Glass Corporation ("AMA") is an importer/exporter of architectural glass products incorporated in Tennessee and headquartered at 1400 Lincoln Street, Kingsport, Tennessee 37660-5174. AMA is the sole importer of Asahi commercial glass into North America, and is the largest importer of AGC Flat Glass Europe's glass. During the Class Period, AMA, directly or through its subsidiaries or affiliates, manufactured and sold Flat Glass to customers in the United States.

33.    Defendants identified in paragraphs 26 through 32 are collectively referred to herein as "Asahi."

34.    Defendant PPG Industries, Inc. is a Pennsylvania corporation with its headquarters located at One PPG Place, Pittsburgh, PA 15272. With facilities in, over 60 countries, in 2007, PPG had sales in excess $11.2 billion. PPG is the largest fiat glass manufacturer in North America, supplying glass for both commercial and residential markets, industrial and specialty uses, and automotive, aircraft and other transportation applications.  During the Class Period PPG Industries, Inc., directly or through its subsidiaries or affiliates, manufactured and sold Flat Glass to customers in the United States.

35.    Defendant PPG Auto Glass, LLC is a consolidated affiliate of PPG Industries, Inc. It is a Delaware corporation with its headquarters located at One PPG Place, Pittsburgh, PA 15272. During the Class Period, PPG Auto Glass, LLC, directly or through its subsidiaries or affiliates, manufactured and sold Flat Glass to customers in the United States.

36.    Defendant PPG Industries International Inc. is a Delaware corporation with its headquarters at IMM Scar Paries La Defense, 1 Avenue du Genem1 de Gaulle, Puteaux, Hauts de Seine, France 92800. During the Class Period, PPG Industries International, Inc., directly or through its subsidiaries or affiliates, manufactured and sold Flat Glass to customers in the United States.

37.    Defendants identified in paragraphs 34 through 36 are collectively referred to herein as "PPG."

C.    **Co-Conspirators**

38.    Various other individual persons and/or entities, the identities of which are presently unknown to Plaintiff, have participated as co-conspirators with one or more of the Defendants, and

1  have engaged in other acts in furtherance of the anticompetitive conduct and antitrust violations

2  alleged herein. Collectively, these individuals and entities shall be referred to herein as the "John

3  Doe Defendants I-X." The acts charged in this Complaint have been done by the John Doe

4  defendants I-X and their co-conspirators, or were authorized, ordered or done by their respective

5  officers, agents, employees or representatives.

## CLASS ACTION ALLEGATIONS

7      39.    Plaintiff brings this action as a class action under Rules 23(a), 23(b )(2) and 23(b)(3)

8  of the Federal Rules of Civil Procedure, on behalf of itself and all others similarly situated. The

9  "Class" is defined as:

> All persons or entities who purchased Flat Glass in the United States
> directly from the Defendants or their co-conspirators (the "Class"), at
> any time from at least January 1,2004 through the date of filing of this
> complaint (the "Class Period"). Excluded from the Class are
> Defendants, any subsidiaries or affiliates of Defendants, and any of
> Defendants' co-conspirators, whether or not named as a Defendant in
> this Complaint.

14      40.    The Class is so numerous that joinder of all members is impracticable. Due to the

15  nature of the trade of the commerce involved, Plaintiff believes that the members of the Class are

16  geographically dispersed throughout the world, including throughout the United States, and that

17  joinder of all Class members would be impracticable. While the exact number of Class members is

18  unknown to Plaintiff at this time, Plaintiff believes that there are, at least, thousands of members of

19  the Class and that their identities can be readily determined from Defendants' and their co-

20  conspirators' books and records.

21      41.    Plaintiff's claims are typical of the claims of the other members of the Class.  Plaintiff

22  and members of the Class purchased Flat Glass at artificially maintained, non-competitive prices

23  established by the actions of Defendants and their unnamed co-conspirators in connection with the

24  restraint of trade alleged herein. Plaintiff and members of the Class have all sustained damage in that

25  they paid inflated prices for the Flat Glass products at issue due to Defendants' conduct in violation

26  of federal law as complained of herein.

27      42.    Plaintiff will fairly and adequately protect the interests of the members of the Class

28  and has retained counsel competent and experienced in class action and antitrust litigation.

1    43.    Common questions of law and fact exist as to all members of the Class which

2  predominate over any questions affecting solely individual members of the Class. Among the

3  questions of law and fact common to the Class are:

4        a.    Whether Defendants conspired, contracted or combined with others, for the

5            purpose of and with the effect of raising, fixing, maintaining, pegging, or

6            stabilizing the price of Flat Glass which was purchased by the Class;

7        b.    Whether Defendants engaged in a combination or conspiracy among

8            themselves to unlawfully implement energy surcharges in the United States;

9        c.    Whether Defendants undertook actions to conceal the unlawful conspiracies,

10            contracts or combinations described herein;

11        d.    Whether Defendants' conduct violated the relevant federal antitrust laws and

12            caused injury to the business and property of Plaintiff and the Class and, if so,

13            the proper measure of damages;

14        e.    The effect of Defendants' conspiracy on the energy surcharge prices, and

15            ultimate prices, charged for Flat Glass during the Class Period; and

16        f.    The appropriate measure of damages sustained by Plaintiff and other members

17            of the Class.

18    44.    A class action is superior to other available methods for the fair and efficient

19  adjudication of this controversy since joinder of all Class members is impracticable. The prosecution

20  of separate actions by individual members of the Class would impose heavy burdens upon the courts

21  and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of

22  law and fact common to the Class. A class action, on the other hand, would achieve substantial

23  economies of time, effort and expense, and would assure uniformity of decision as to persons

24  similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

25    45.    The interest of members of the Class in individually controlling the prosecution of

26  separate actions is theoretical rather than practical. The Class has a high degree of cohesion, and

27  prosecution of the action through representatives would be unobjectionable. The amounts at stake for

28  class members, while substantial in the aggregate, are not great enough individually to enable them

1  to maintain separate suits against Defendants. Plaintiff does not anticipate any difficulty in the

2  management of this action as a class action.

3  ## INTERSTATE TRADE AND COMMERCE

4  46.    During the Class Period, Defendants were dominant participants in the worldwide

5  Flat Glass industry, including the United States. Throughout the Class Period, there has been a

6  continuous and uninterrupted flow of transactions and shipments in Flat Glass in interstate and

7  international commerce throughout the United States and the world.

8  47.    The unlawful activities of Defendants and the unnamed co-conspirators have been

9  within the flow of, and have had a direct, substantial, and reasonably foreseeable effect on interstate

10  and international commerce.

11  ## FACTS

12  ### The Flat Glass Market

13  48.    Defendants are the largest producers of Flat Glass in the world.  Just five Defendants

14  PPG, NSG/Pilkington, Saint-Gobain, Asahi and Guardian produce over 70 percent of the world's

15  high-quality float glass. Much of the world's lower quality float and sheet glass production is being

16  replaced by high quality float.

17  49.    The global Flat Glass market in 2005 was approximately 41 million tons, with a value

18  of approximately $19 billion. Of the 41 million tons, 25 million tons were high quality float glass, 3

19  million tons were sheet glass production, 2 million tons were rolled glass, and the remaining 11

20  million tons were lower quality float glass, which is produced mainly in China.

21  50.    A proportion of the high quality float glass, and some of the rolled glass, is further

22  processed by laminating, toughening, coating and silvering, for use typically in insulating glass

23  units or automotive glazings. At this level, the market has a value of approximately $56 billion.

24  51.    According to the European Union, Asahi, Guardian, NSG/Pilkington and Saint-

25  Gobain hold a combined 80 percent market share in the European Flat Glass market.

26  52.    North America, dominated by the United States, is a mature market with annual Flat

27  Glass market growth estimated at four percent during the next three years. The construction market

28  accounts for between 55% and 60% of total demand, but will almost certainly decline with the

1  slowdown in U.S. residential construction activity. Fry Consultants Inc., *Global Flat Glass Market*

2  *Overview*, *A Presentation* for the *ANSAC Global Distributor Meeting*, Sept. 19, 2006, at p.14,

3  http://www.fryconsultants.com/GLOBAL_FLA T _GLASS_MARKET _OVER

4  VIEW.ppt#268,14,FLAT GLASS MARKET: NORTH AMERICA PROFILE.

5      53.    Four manufacturers represent roughly three-quarters of capacity in the North

6  American Flat Glass market. Defendants PPG, Asahi, Guardian, and NSG/Pilkington comprise these

7  four companies. Defendant PPG's market share is estimated at 20 percent, Defendant Asahi's market

8  share is estimated at 20 percent, Defendant Guardian's market share is estimated at 19 percent, and

9  Defendant NSG/Pilkington's market share is estimated at 14 percent. *Id.*

10      54.    The U.S. Flat Glass manufacturing industry's revenue in 2006 was approximately

11  $3.7 billion with a 35.68 percent gross profit of $1.32 billion.

12      55.    The Flat Glass manufacturing industry total revenue is estimated to have generated

13  growth averaging 3.4 percent per annum over the five years to 2007, which is underpinned by

14  cyclical growth in the housing market during the mid-2000s, and recent growth in commercial

15  building activity.

16      56.    The demand for Flat Glass stems largely from the housing and nonresidential building

17  markets and the automotive assembly and repair market. Flat Glass is processed for a variety of uses

18  in the building and automotive industries, including: windows; glass wall panels; glass bricks and

19  blocks; doors and shower screens; windscreens; and mirrors. The key factors driving demand in

20  these industries are prevailing interest rates, the pace of general economic growth, growth in

21  household income and employment, growth in company profitability, and current and expected

22  property values.

23      57.    Exports of Flat Glass products grew by an average 6.5 percent per annum over five

24  years to 2006 and are estimated to have remained stable in 2007.

25                **The Flat Glass Industry Is Conducive To Collusion**

26      58.    Flat Glass is a commodity product that is uniform.  It does not vary materially

27  depending upon manufacturer.  The Flat Glass manufactured by any Defendant is fungible with any

28  other Defendant's flat Glass.

59.    The Flat Glass industry in the United States and worldwide is concentrated, so as to facilitate the coordination of prices of Flat Glass.

60.    The Defendants collectively are the principal manufacturers of Flat Glass domestically and worldwide.

61.    The Flat Glass market is considered to have particularly high barriers to the entry of new competitors. The principal barriers to entry into the main industry segments are the dominance of existing vertically and horizontally integrated producers and the high sunken capital required to compete for market share.

62.    Defendants implemented their price-fixing arrangement in two ways: (1) they agreed to raise prices to customers in a coordinated fashion; and (2) they agreed to implement identical "energy surcharge" programs and charge identical energy surcharges to their customers so as to raise the price of Flat Glass.

63.    In implementing their conspiracy, Defendants at times engaged in practically simultaneous conduct, unsupported by existing economic and market conditions, demonstrating that their activities were the result of prior knowledge, coordination, and agreement, as opposed to truly independent activity.

### Trade Association and Industry Meetings

64.    In the United States and Europe, Defendants' meetings were facilitated by, and occurred under cover of membership in trade associations.

65.    The European Commission, which – as discussed further below - found that Defendants (through their foreign counterparts) organized their Construction Flat Glass cartel in Europe through meetings in restaurants and hotels in 2004 and 2005, focused its investigation on a European trade association of flat glass manufacturers known as the European Association of Flat Glass producers, or by its French name Groupement Europeen des Producteurs de Verre Plat ("GEPVP"). (In September of 2007, GEPVP changed its name to "Glass For Europe. ")

66.    The four member companies of GEPVP are: AGC, Guardian, Pilkington, and Saint-Gobain - i.e., precisely the four companies found by the European Commission to be members of the European flat glass cartel in 2004 and 2005.

67.    The North American counterpart to GBPVP is the Flat Glass Manufacturing Division of the Glass Association of North America ("GANA "). GANA's Flat Glass Manufacturing Division was established in 2003.

68.    GANA's stated mission is to "provide a forum for exchanging information and ideas, for reaching consensus and presenting a unified voice on matters affecting the glass industry." GANA proclaims that it provides a forum to "put members in regular contact with their peers" and that it strives to provide its members "networking opportunities."

69.    The Flat Glass Manufacturing Division of GANA has as full members the primary flat glass manufacturers in North America - including AFG (Asahi), Guardian, PPG, and Pilkington - who met regularly during the Class Period under the auspices of the association.

### Flat Glass Price Increases in the United States

70.    Commencing on or around September of 2000, Defendants conspired, contracted or combined amongst themselves and with others, for the purpose of and with the effect of raising, fixing, pegging, maintaining or stabilizing the price of Flat Glass and other commercial conditions for deliveries of Flat Glass purchased by the Class. Defendants implemented this conspiracy by, among other activities, collusively imposing illegal energy surcharges based on publicly reported energy commodity prices, such as those for Brent crude.

71.    In late 2000, certain Defendants first implemented an energy surcharge in the amount of $300/per truckload. Shortly thereafter, Defendants increased this energy surcharge to $500/per truckload.

72.    By January 1, 2001, defendants raised the energy surcharge to $500 per truckload of raw glass. This surcharge was applied identically by all defendants regardless of the size or weight of the glass being shipped or picked up at the plant.

73.    At some point in 2001, as a result of a decrease in natural gas prices, the energy surcharge was no longer being imposed. After attending meetings of GANA, all defendants re-implemented energy surcharges, effective in June 2002, despite continued low natural gas pricing. During the 2002-2003 time period, defendants also implemented price increases and a series of plant and line closures to cut back on excess capacity that existed in the construction flat glass industry at

CLASS ACTION COMPLAINT

1    that time. Despite these closures, capacity utilization was in the low to mid 80% range throughout
2    this period.

3        74.    Over the following years, Defendants unlawfully agreed to modify their energy
4    surcharges based on a common formula. This formula based the price of the energy surcharge on the
5    price of a barrel of Brent crude oil sold at London's International Petroleum Exchange (IPE).

6        75.    Defendants implemented and adjusted these energy surcharges at the same time and
7    in the same amounts, without regard to their actual energy costs. In fact, many of the Defendants
8    effectively insulated themselves from rising energy costs by entering into long term contracts for the
9    supply of natural gas.

10        76.    Defendants at times made public statements attempting to explain the various fees
11    and surcharges being implemented. For example, On November 3, 2004, Stuart Chambers, Chief
12    Executive of Pilkington, explained during a telephone interview that the surcharge is based on rising
13    gas and electricity costs. He noted that "[w]e are not alone, other European glassmakers have
14    followed our lead" in regard to implementing the new fees to its customers.

15        77.    By the beginning of 2005, as a result of the earlier closures, capacity utilization had
16    risen to 90%. However, as a result of falling natural gas prices, in March 2005 defendants were
17    forced to lower their energy surcharges by $100 to $800 per truckload. In order to recoup this
18    income, defendants met through GANA and, within one month of this reduction they announced the
19    imposition of a $100 diesel fuel surcharge which was to be adjusted based on the twelve week
20    average price of diesel fuel published by the Department of Energy.

21        78.    When customers in the United States voiced complaints to Flat Glass manufacturers
22    about the energy surcharge, Defendants rescinded the surcharge and implemented a uniform three
23    percent price increase. Relief on Fuel Surcharge; glass prices rise, Glass Magazine, May 2005,
24    http://www.glassmagazine.net/archivednews.php?id=739. For example, Defendant Guardian
25    announced that the company would not have a diesel-fuel surcharge in the United States and then
26    unveiled a three percent price increase on April 27, 2005. *Id.*

27        79.    AFG Industries, now Defendant AGC Flat Glass North America, followed Defendant
28    Guardian, announcing its three percent price increase on April 29, 2005 for all clear, tint, tempered

1  and coated products. AFG Industries' letter to its United States customers stated that "continuing

2  cost pressures across the board exceeds our ability to meet your requirements without increasing

3  prices." *Id.*

4      80.     Frederick E. Wallin, AFG Vice President of Marketing, stated in an interview that

5  medical insurance, fuel surcharges from trucking companies and natural gas numbered among the

6  company's inflationary budget items. Wallin also stated that fabricators didn't like the diesel-fuel

7  surcharge because it was confusing and difficult to implement or pass along to their customers. *Id.*

8      81.     Defendant Pilkington North America announced a $100 diesel-fuel surcharge on

9  April 22, 2005 and rescinded it on May 5, 2005. Instead, Pilkington North America implemented a

10  three percent price increase for all products that became effective May 16,2005. *Id.*

11      82.     In a letter to customers announcing the price increases, Stephen E. Weidner,

12  Pilkington North America Vice President of Sales and Marketing, wrote: "We heard and understand

13  the issues you raised regarding the diesel surcharge and, in response, are delaying implementation.

14  Diesel costs have been volatile and are likely to continue that way into the future." The letter

15  continued: "Unfortunately, the cost increases are real and we cannot continue to absorb them,"

16  Weidner wrote. "Consequently, there will be a 3 percent price increase for all products effective

17  May 16." *Id.*

18      83.     These and other price increases by Flat Glass manufacturers in the United States

19  during the Class Period were made pursuant to the unlawful price fixing conspiracy alleged herein.

20                          **European Investigation**

21      84.     Defendants are among the largest producers of Flat Glass in the world.

22      85.     During the Class Period, Defendants jointly participated in meetings in restaurants

23  and hotels during which they discussed and agreed to the level and timing of price increases, energy

24  surcharges, target prices, minimum prices, other commercial conditions for deliveries of Flat Glass,

25  and exchanged other sensitive commercial information.

26      86.     On February 24, 2005, the European Commission ("EC") announced that, on

27  February 22 and February 23, 2005, it had raided the offices of Flat Glass manufacturers, seeking

28  evidence of a price-fixing cartel in the Flat Glass industry. The EC issued a statement in which it

1  announced that it "ha[d] reason to believe that the manufacturers concerned may have (amongst

2  other things) coordinated price-increases and agreed on the introduction of a so called 'energy

3  surcharge' in the area of flat glass." The EC officials were accompanied by their counterparts from

4  the relevant national competition authorities.

5      87.     Defendant Pilkington confirmed on February 24, 2005 that EC officials raided a

6  number of its company locations in Europe.

7      88.     Defendant Saint-Gobain confirmed on February 24, 2005 that EC officials raided two

8  of its European locations in connection with the Commission's investigation into the Flat Glass

9  division's compliance with competition law rules.

10      89.     Defendant Asahi confirmed on February 25, 2005 that EC officials had raided the

11  offices of its Belgian subsidiaries, AGC Automotive Europe S.A. and Glaverbel S.A., recently

12  renamed AGC Flat Glass Europe.

13      90.     On March 14, 2007, the EC confirmed that it sent a Statement of Objections, which

14  are formal written allegations of unlawful anticompetitive conduct, to the participants in a cartel for

15  Flat Glass.

16      91.     Defendant Asahi confirmed on March 14, 2007 that its European subsidiary,

17  Glaverbel S.A., received a Statement of Objections on March 13, 2007 from the EC with respect to

18  anticompetitive behavior in the Flat Glass industry. Asahi stated that Glaverbel S.A. would examine

19  the EC's preliminary findings and respond in due course.

20      92.     Defendant NSG/Pilkington confirmed on March 14, 2007 that it also received a

21  Statement of Objections from the EC relating to violations of competition rules by a number of glass

22  manufacturers. NSG/Pilkington announced that it would study the Statement of Objections in detail

23  and prepare its response.

24      93.     Defendant Saint-Gobain confirmed on March 14 ,2007, that it had received a

25  Statement of Objections from the EC in connection with an investigation of competitive practices in

26  the Flat Glass industry.

27      94.     On November 28, 2007, the EC announced in a press release that it had imposed

28  fines, totaling € 486.9 million ($723 million), on Defendants Guardian, Saint-Gobain,

1  NSG/Pilkington, and Asahi for their participation in a cartel in the Flat Glass market, in which they

2  coordinated price increases, fixed minimum prices and other commercial conditions for deliveries of

3  Flat Glass, and exchanged other commercially important and confidential information. The EC

4  found these Defendants' activities to violate the bans on cartels and restrictive business practices

5  contained in the EC Treaty and the EEA Agreement (Article 81 of the EC Treaty and Article 53 of

6  the EEA Agreement). Competition Commissioner Neelie Kroes stated that "[t]he Commission will

7  not tolerate companies cheating consumers and business customers by fixing prices and depriving

8  them of the benefits of the Single Market."

9       95.    Specifically, Defendant Asahi was fined € 65 million ($96.7 million), after

10  substantially cooperating under the EC's Leniency Program. Additionally, Defendant Guardian was

11  fined € 148 million ($220 million), Defendant NSG/Pilkington was fined € 140 million ($208

12  million), and Defendant Saint-Gobain was fined € 133.9 million ($199.2 million). According to The

13  Guardian, the total fine was the fifth largest ever imposed by the Commission for anti competitive

14  behavior. Angela Balakrishman, *EU fines makers of window glass record €487m for fixing prices,*

15  The Guardian, http://www .guardian.co.uk/business/2007/nov/29/europeanunion.europeanunion

16       96.    The press release announced that the EC started its Flat Glass investigation on its own

17  initiative on the basis of market information provided by several Member States' National

18  Competition Authorities. The press release further stated that surprise inspections were carried out in

19  February and March 2005 at the premises of Defendant Asahi' s and Defendant Guardian's

20  European subsidiaries, as well as at the premises of Defendant Pilkington, Defendant Saint- Gobain,

21  and the

22  European Association of Flat Glass Producers. In between the two rounds of inspections, Asahi and

23  its European subsidiary, Glaverbel (now AGC Flat Glass Europe), made an application under the

24  EC's leniency laws. Both Defendants cooperated with the EC and provided additional evidence of

25  unlawful cartel behavior.

26       97.    The EC investigation revealed that between 2004 and 2005, Defendants Asahi,

27  Guardian, Pilkington and Saint-Gobain managed to raise or otherwise stabilize Flat Glass prices

28  through a series of hotel and restaurant meetings, during which they discussed and agreed to the

1 level and timing of price increases, target prices, minimum prices and/or exchanged sensitive

2 commercial information.

3     98.     During a November 28, 2007 press conference in Brussels, Neelie Kroes,

4 Competition Commissioner, stated: "The companies involved knew all too well that what they were

5 doing was illegal. They thought that they would not be found out. They thought that the increased

6 prices that they agreed were worth the risk. They were wrong."

7     99.     The EC press release stated that the cartel concerned Flat Glass used to make double-

8 glazing windows, glass doors, fire-resistant glass, and mirrors.

9     100.     Commissioner Kroes additionally said during the press conference: "The companies

10 profited from selling flat glass at artificially inflated prices. The direct victims were the buyers of the

11 Flat Glass, companies who made products such as double-glazing and safety glass. "

12     101.     NSG confirmed on November 28, 2007 that a fine had been levied against Pilkington,

13 one of its subsidiaries.

14     102.     Defendant Asahi confirmed on November 28, 2007 that its European subsidiary,

15 AGC Flat Glass Europe SA (formerly Glaverbel SA), and Asahi had been fined 65 million euros by

16 the EC. Asahi further stated that both companies replied to the Statement of Objections concerning

17 Flat Glass on May 14,2007 and had cooperated with the Commission during the investigation.

18     103.     According to an Associated Press article, Defendant Guardian acknowledged the fine

19 on November 28, 2007.

20     104.     On January 15,2008, Asahi issued a press release on its website, stating: "Asahi's

21 management deeply regrets its subsidiaries' possible involvement in any conduct which may be

22 considered by the competent authorities in violation of the law and, in particular, of antitrust laws."

23     105.     Asahi further announced in the press release that some executives would take as

24 much as a 30 percent pay cut for three months, commencing in January, as a consequence of the

25 investigation by the EC: "to giv[e] a strong signal to all of Asahi's subsidiaries and stakeholders of

26 their deep regret and of the importance they attribute to full compliance with antitrust laws. . ."

27     **ALLEGATION OF ANTITRUST INJURY TO PLAINTIFF AND THE CLASS**

28     106.     The combination and conspiracy alleged herein had and is having the following

1    effects, among others:

2          a.    prices charged to Plaintiff and the Class for Flat Glass have been fixed or

3                stabilized at higher, artificially derived, non-competitive levels;

4          b.    Plaintiff and the Class have been deprived of the benefits of free, open and

5                unrestricted competition in the market for Flat Glass; and

6          c.    competition in establishing the prices paid in the United States and worldwide

7                for Flat Glass has been unlawfully restrained, suppressed and eliminated.

8          107.   By reason of the violations of Section I of the Sherman Act and Section 4 of the

9    Clayton Act, Plaintiff and the Class have sustained injury to their business or property. The injury

10   sustained by the Plaintiff and the Class is the payment of supracompetitive prices for Flat Glass as a

11   result of Defendants' illegal contract, combination, and conspiracy to restrain trade as alleged. This

12   is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

13                            **FRAUDULENT CONCEALMENT**

14         108.   Defendants fraudulently concealed their participation in the conspiracy alleged herein

15   by, inter alia, engaging in secret meetings and communications in furtherance of the conspiracy, and

16   by holding themselves out as competitors to the public, to Plaintiff, and to the Class.  Because of

17   such fraudulent concealment, Plaintiff and the Class could not have discovered the existence of this

18   conspiracy any earlier than its public disclosure.

19         109.   By its very nature, Defendants' price-fixing conspiracy was inherently self-

20   concealing.  As alleged above, Defendants had secret discussions about pricing, output, and any fees

21   or surcharges they would levy on their customers.  Defendants agreed not to discuss publicly the

22   existence or the nature of their agreement.

23         110.   As alleged above, despite being insulated from some of the effects of rising energy

24   costs, Defendants charged their customers these previously agreed upon surcharges and fees without

25   regard to their actual energy costs.  In one example of Defendants attempts to justify their actions, a

26   CEO of one of the Defendants publicly stated that rising costs of gas and electricity were the reasons

27   for the price increases and that other "glassmakers have followed our lead."

28         111.   Plaintiffs had no reason to disbelieve these statements which on their face appeared to

1    explain reasonably the increase in prices, and added surcharges and fees.   Furthermore, information

2    regarding Defendants true energy costs were not in the public domain and/or involved proprietary

3    information that was within Defendants' control, such that Plaintiff could not verify their accuracy.

4    Defendants' purported reasons for the price increases and/or surcharges and fees were materially

5    false and misleading and were made for the purpose of concealing Defendants' anti-competitive

6    scheme as alleged herein.

7         112.    These affirmative acts of the Defendants, including acts in furtherance of the

8    conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

9         113.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of

10    any statute of limitations has been tolled with respect to any claims that Plaintiff has as a result of

11    the anticompetitive conducted alleged in this Complaint.

12                              **VIOLATIONS ALLEGED**

13                              **First Claim For Relief**

14    **(Violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act)**

15         114.    Plaintiff incorporates by reference the allegations in the above paragraphs as if

16    fully set forth herein.

17         115.    Defendants and the unnamed co-conspirators entered into and engaged in a contract,

18    combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman

19    Act and Section 4 of the Clayton Act.

20         116.    The contract, combination or conspiracy has resulted in an agreement, understanding

21    or concerted action between and among Defendants and the co-conspirators in furtherance of which

22    Defendants fixed, maintained, and standardized prices for Flat Glass. Such contract, combination, or

23    conspiracy constitutes a per se violation of the federal antitrust laws and is, in any event, an

24    unreasonable and unlawful restraint of trade.

25         117.    Defendants' contract, combination, agreement, understanding or concerted action

26    with the co-conspirators occurred in or affected interstate and international commerce. Defendants'

27    unlawful conduct was through mutual understandings or agreements by, between and among

28    Defendants and the co-conspirators. These other co-conspirators have either acted willingly or, due

1    to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

2        118.    The contract, combination or conspiracy has had the following effects:

3            a.    prices charged to Plaintiff and the Class for Flat Glass were fixed or stabilized

4                at higher, artificially derived, non-competitive levels;

5            b.    Plaintiff and the Class have been deprived of the benefits of free, open and

6                unrestricted competition in the market for Flat Glass; and

7            c.    competition in establishing the prices paid, customers of, and territories for

8                transportation services of Flat Glass has been unlawfully restrained,

9                suppressed and eliminated.

10        119.    As a proximate result of Defendants' unlawful conduct, Plaintiff and the Class have

11    suffered injury in that they have paid supracompetitive prices for Flat Glass.

12                            **PRAYER FOR RELIEF**

13        WHEREFORE, Plaintiff prays for relief as follows:

14        A.    That the Court determine that this action may be maintained as a class action under

15    Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be appointed a class

16    representative and that Plaintiff's counsel be appointed as counsel for the Class;

17        B.    That the unlawful contract, combination and conspiracy alleged in Count I be

18    adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1

19    of the Sherman Act;

20        C.    That Plaintiff and the Class recover compensatory damages, as provided by law,

21    determined to have been sustained as to each of them, and that judgment be entered against

22    Defendants on behalf of Plaintiff and each and every member of the Class;

23        D.    That Plaintiff and the Class recover treble damages, as provided by law; That Plaintiff

24    and the Class recover their costs of the suit, including attorney's fees, as provided by law;

25        E.    That Defendants be enjoined from engaging in the anticompetitive and unlawful acts

26    described herein; and

27    ///

28    ///

1        F.    Such further relief as the Court may deem just and proper.

2    Dated: April   , 2008              Respectfully submitted,

3

4                                            Pamela E. Woodside

5                                    FRANCIS O. SCARPULLA (41059)

6                                    CRAIG C. CORBITT (83251)
                                MATTHEW R.SCHULTZ (220641)

7                                    PAMELA E. WOODSIDE (226212)
                                TRAVISS GALLOWAY (234678)

8                                    ZELLE, HOFMANN, VOELBEL, MASON
                                & GETTE LLP

9                                    44 Montgomery Street, Suite 3400
                                San Francisco, CA 94104

10                                    Telephone:    (415) 693-0700
                                Facsimile:    (415) 693-0770

11                                      fscarpulla@zelle.com
                                ccorbitt@zelle.com

12                                    *Attorneys for Plaintiffs*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT

1

**DEMAND FOR JURY TRIAL**

2        Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by

3   jury for all issues so triable.

4   Dated: April       , 2008                              Respectfully submitted,

5

6                                                          Pamela E. Woodside

7                                                          FRANCIS O. SCARPULLA (41059)
                                                           CRAIG C. CORBITT (83251)
8                                                          MATTHEW R.SCHULTZ (220641)
                                                           PAMELA E. WOODSIDE (226212)
9                                                          TRAVISS GALLOWAY (234678)
                                                           ZELLE, HOFMANN, VOELBEL, MASON
10                                                         & GETTE LLP
                                                           44 Montgomery Street, Suite 3400
11                                                         San Francisco, CA 94104
                                                           Telephone:     (415) 693-0700
12                                                         Facsimile:     (415) 693-0770
                                                           fscarpulla@zelle.com
13                                                         ccorbitt@zelle.com

14                                                         *Attorneys for Plaintiffs*

15

16

17

18

19   3172835.v4

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT